

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

KARIN SODERBERG          :
                         :
    Plaintiff,           :
                         :
V.                       :    CIVIL NO.: 3:02CV02010 (PCD)
                         :
GUNTHER INTERNATIONAL, INC. :
                         :
    Defendant            :    November 10, 2003

### AFFIDAVIT OF KARIN SODERBERG

I, Karin Soderberg, having being duly sworn do depose and state:

1.   I am the plaintiff in this action and I have reviewed the defendant's Motion for Summary Judgment and accompanying papers, including the affidavit of Marc I. Perkins, attached to defendant's motion as Exhibit A.

2.   My date of birth is April 25, 1936. I am presently 67 years old. I was 63, nearly 64, years old at the time of my discharge from Gunther International, Ltd. (hereafter "Gunther") on January 28, 2000.

3.   The statements I make herein are based upon my personal knowledge and in some instances based upon information contained in business records of Gunther disclosed and produced in the course of discovery in this civil action.

4.   My background is a follows. I graduated from Wellesley College in 1958 with a Bachelor of Arts Degree. I was a teacher for some twelve years in the employ of a company which

offered reading and study skills instruction for high school students, college students and business people. Thereafter, I was employed for twelve years in various capacities at Xerox Learning Systems, a division of the Xerox Corporation, which division was later sold to another company but I remained employed with the division. Throughout my employment with Xerox, I performed commendably, received outstanding annual reviews and left the employ of that company on very good terms. I had decided to relocate to the State of Rhode Island and thus sought and received an offer of employment from Gunther. A true copy of the resume that I submitted to Gunther is attached hereto as Exhibit 1.

5.  I commenced my employment with Gunther in June of 1989, initially in an assistant position reporting to the President of Gunther and later, was given increased responsibility for starting up a sales department. My superiors were pleased with my performance. I later became the Marketing Communications Manager and had added responsibilities.

6.  Gunther designs and manufactures high-tech mailing systems that serve to automate document production and mailing processes for large businesses. The machines involved are complex, software-driven and customized to the business clients' needs.

7.  As Marketing Communications Manager, my primary responsibility was to design, develop and oversee the production of print and video materials that would market Gunther's technology and services to the business community.

8.  When I started working for Gunther in the capacity of Sales Administrative Assistant,

I was compensated with an annual salary of approximately $30,000.00. After three months of employment, my performance was viewed favorably, and I thus was awarded a $3,280.00 salary increase, bringing my annual compensation to $33,280.00. At the time, my direct supervisor was Joseph E. Lamborghini. Mr. Lamborghini viewed my performance quite favorably and told me so on more than one occasion. Gunther noted in my personnel record that the reason for the increase was that I had displayed "very good performance." A true copy of that record is attached hereto as Exhibit 2.

9. On or about January 8, 1990, I was promoted to the position and new title of Sales Office Manager. This promotion was authorized and awarded by William H. Gunther, III, to whom I was then directly reporting and who was Vice-President of Marketing for Gunther. Mr. Gunther announced my appointment to the position of Sales Office Manager in a memorandum distributed to officers, managers and other employees on January 19, 1990. A true copy of it is attached hereto as Exhibit 3.

10. Throughout the time I performed my responsibilities as Sales Office Manager, William H. Gunther, III always expressed not only satisfaction, but pleasure with my performance. On many occasions, he stated that he had much confidence in my ability and that he was most pleased with my performance.

11. Gunther's practice is to evaluate, formally or informally, employees on an annual basis. Such was my experience, and I received annual performance-based raises. In addition to

3

those salary increases already mentioned, my annual review and compensation history is as follows:

A    On October 8, 1990, I was awarded another substantial salary increase bringing my annual compensation to $45,000.00. In connection with this raise, William H. Gunther, III once again indicated his pleasure with my performance, which was a stated factor in the decision to award me a substantial increase. The record of this is attached hereto as part of Exhibit 2.

B.    On September 14, 1992, I received another substantial salary increase in my annual compensation to $49,500.00. Once again, William H. Gunther, III indicated continued pleasure with my performance which merited the substantial increase. The record of this is attached hereto as part of Exhibit 2.

C.    On September 12, 1994, my salary was radically decreased from $49,500.00 to $28,000.00 per year. (Exhibit 2) This was the period of time when the company was experiencing financial difficulties. In addition to financial cutbacks, employees were laid off. I was not laid off, but retained. The reduction in my annual compensation was authorized by one George Janz, a supervisor. Nine months later, however, Mr. James Whitney, then President and Chief Executive

4

Officer of Gunther, substantially reinstated my salary to $42,000.00. Effective July 31, 1995 I was given what Gunther considered to be a promotion and my title changed from Marketing Manager to Marketing Communications Manager. A true copy of the record of promotion is attached hereto as part of Exhibit 2. Mr. Whitney spoke to me many times regarding his opinion of my skills, abilities and performance, and he always spoke very highly of me. He never had any problems with my performance. To the contrary, all of his reviews of my performance were extremely complimentary. At that time, while Gunther did not issue formal performance evaluations for managers at my level, that is to say, on a pre-printed form such as those used by other companies, Mr. Whitney would take the time to send notes or make other personal comments in writing indicating his pleasure with my performance. For example, on August 4, 1997, I received a note from Mr. Whitney indicating that I had done a "good job" and he was very pleased with one of the projects that I had completed which was production of a company newsletter. A true copy of that communication is attached hereto as Exhibit 4.

D.     In connection with Mr. Whitney's decision to increase my salary on

5

   July 28, 1995, Mr. Whitney asked to speak to me personally and I met with him on that day. He handed me a memorandum explaining his decision to substantially reinstate my salary despite the company's financial problems, and further indicated that he wished to grant me further salary increases as the company's position improved. Mr. Whitney again complimented me on my performance and stated that I was valuable to the company. A true copy of his memorandum of July 28, 1995 is attached hereto as Exhibit 5.

E. On August 1, 1996, I received still another performance-based salary increase bringing my annual compensation to $44,100.00. Again, this decision was made by the President and CEO, James Whitney. In connection with the award of this salary increase Mr. Whitney once again complimented me on my performance, my dedication to the company and stated that my skills and work were valuable and much appreciated by Gunther. A true copy of the record of that increase is attached hereto as part of Exhibit 2.

F. On August 1, 1997, I received another performance-based salary increase which brought my annual compensation to $46,300.00. This salary increase was also awarded by Mr. Whitney who once again stated that my performance continued to be excellent, my skills were

6

especially valued in the marketing area, and I was much appreciated by Gunther. A true copy of the record of that increase is attached hereto as part of Exhibit 2.

G. On or about February 8, 1999, a decision was made to give me still another performance-based salary increase and it was further decided to make the increase retroactive to August 1, 1998. With respect to this particular increase, William H. Gunther, III was not involved in the decision, as he had assumed new responsibilities as head of what was called the "inc.jet" Division of Gunther. This performance-based salary increase award retroactive to August 1, 1998 was approved by my supervisor, Jewell Smokes, Michael Vehlies and Marc Perkins, the President and CEO of Gunther. All three individuals signed the "Approval" section of the record of the performance-based increase. A true copy of that form is attached hereto as part of Exhibit 2. I am familiar with the names and signatures on the "Approval" section and within that section next to the indication "CEO" appears the signature of Marc Perkins.

12. For the last nine months of my employment with Gunther, I was no longer supervised by Jewell Smokes. Mr. Smokes was reassigned to focus on Sales rather than Marketing. I was assigned to report to Mr. Daniel Chevalier, Vice-President of Sales and Marketing. Previously, my immediate supervisor, Jewell Smokes, reported directly to Daniel Chevalier on issues related to marketing. Jewell Smokes made it clear to me numerous times that he was extremely pleased with

7

my performance and I know he reported his views to his own superiors as they also approved salary increases for me that were based on good performance.

13. I have reviewed the affidavit of Marc I. Perkins appended to Defendant's Motion for Summary Judgment as Exhibit A. In paragraph 14 of his affidavit, Mr. Perkins states that he was aware that Jewell Smokes had a positive view of my performance and had authored a positive written performance review, but that he "discounted" the evaluation "because Mr. Smokes was located in Atlanta and did not have an opportunity to observe [me] on a daily basis." Mr. Perkin's statement is incorrect to the extent that it suggests Mr. Smokes was not in the best or even a good position to evaluate my skills and performance. I reported to Mr. Smokes for over well over a year, and while it was true that he was based primarily in Atlanta, he did travel to the Norwich, Connecticut office more than several times a year and/or as frequently as was needed. Despite the difference of location, I reported to Mr. Smokes on a weekly basis by telephone, through e-mail communications and weekly written reports. The nature, extent and quality of communication between us was no different in kind than if our offices were in the same building. The information he possessed about my performance of duties would not have been different had he worked primarily out of the Norwich office.

14. Further contrary to Mr. Perkins' claim is the fact that when I later reported to Daniel Chevalier, I had much less contact with Mr. Chevalier than I had with Mr. Smokes. At most, Mr. Chevalier hoped to have once-a-week meetings with me, a number of which he failed to attend because he frequently traveled and was on the road meeting with Sales Directors. Thus, Mr. Perkins' statement that Mr. Chevalier was in a better position to evaluate me is inaccurate since Mr.

8

Chevalier was often away and had not nearly the extent of contact with me and review that existed when I reported to Mr. Smokes. In fact, the reporting mechanism that Mr. Chevalier used was not different than that which was used when I reported to Mr. Smokes. Mr. Chevalier also wanted written reports on a weekly basis, which is exactly how I reported to Mr. Smokes. Mr. Chevalier indicated his intent, with respect to these reports, to communicate with us and sent inquires via e-mail, the same method of communication he used with sales directors. With respect to the weekly reports, he wanted the reports e-mailed to him once a week, which is exactly the type of reporting method used by Mr. Smokes. I reported to Mr. Smokes on a weekly basis through e-mail. We communicated by e-mail and in person when he would see the need for it upon his appearance in the Norwich, Connecticut office. In addition, there were numerous teleconferences with Mr. Smokes whereas Mr. Chevalier did not make himself available much for teleconferences due to his numerous other responsibilities. Thus, there was actually more communication, consultation review and oversight of my work when I reported to Mr. Smokes. True copies of e-mails, from Mr. Chevalier which indicated his preferred reporting method are attached hereto as Exhibit 6.

15. Marc Perkins, in paragraph 14 of his affidavit, states that his opinion that I was incompetent was shared by Mr. Chevalier. Gunther's moving papers do not include any affidavit or other statement from Mr. Chevalier. Moreover, throughout the time that I knew and worked with Mr. Chevalier, he never once notified me that my performance in general or on any particular tasks was incompetent or unacceptable. Mr. Chevalier never once indicated to me that the new CEO, Mr. Perkins, was unhappy with my performance. I cannot imagine how Mr. Perkins could even develop

an opinion because he had hardly any contact with me at all.

16. Based on my decade of employment with Gunther, my level of job responsibility and the management hierarchy at Gunther, it would be unheard of for someone in my position to be performing in an incompetent manner and not be advised of such by my immediate supervisor and the company's CEO.

17. The last performance review I received, in February of 1999, less than 12 months before my sudden discharge, was very positive and complimentary and rated me as "outstanding" or "exceeding" job requirements in all categories. A true copy is attached hereto as Exhibit 7. The last several pages of Exhibit 7 were drafts of the review while the more formal signed version is the official one. It was issued to me on February 8, 1999 and signed by my supervisor on February 3, 1999. From February 8, 1999 until my sudden discharge on January 28, 2000, I received no further reviews and no warning that my performance was considered "incompetent".

18. The first occasion on which I ever heard of any statement by a company official to the effect that my performance was bad or that I was incompetent was on the very day that I was fired. On Friday, January 28, 2000, at 3:00 p.m. Mr. Chevalier summoned me to a meeting with him. Upon my arrival he tersely stated that he had prepared an "unfavorable" written evaluation of my performance. He further stated that Marc Perkins told him to "get rid of [me]". He did not show me any such written evaluation, but instead read a few excerpts from a document which he held in his hand but which I could not see. Mr. Chevalier would not give me a copy of it and instead stated that an evaluation would be sent to my home by mail. He told me I was discharged effective

10

immediately and I was to leave and not return to Gunther. I was in shock over this event since it was completely unexpected. Prior to January 28, 2000, Mr. Chevalier never said or did anything to suggest that my performance had slipped from its ten-year pattern of excellence, much less that it had slipped to the point where termination of my employment was necessary. I never received any oral warnings, oral counsels or even so much as a criticism of any aspect of my performance or my work on any project or task. This discharge was so abrupt and the notice to me that my performance was unacceptable was a complete shock and news to me because I had never before been given a hint of this.

19. The unsatisfactory written performance review prepared by Mr. Chevalier, and which I received in the mail post-discharge, is appended to defendants' motion as Exhibit C. Defendants' Exhibit C contains several statements which indicate or imply that I was "spoken to" about one or more deficiencies in the past. This is not true. All of the criticisms contained in this post-discharge document were complete news to me.

20. In the last nine months of my employment, I contributed more to Gunther than I had done in all of my years at Gunther because of the marketing activity that was going on at the company. I worked very long hours. I alone was responsible for implementing Gunther's new image by working with outside consultants in the design of new ads, newsletters, brochures and posters. It was I who handled the responsibility for implementing a newly designed company newsletter called "Innovations" in early 1999. My work in producing this marketing tool resulted in my receiving high praise and compliments from James Whitney, the former President and CEO and Mr. Perkins'

predecessor. A true copy of that marketing document is attached hereto as Exhibit 8. I had also previously received high compliments from a client of Gunther in respect to my marketing efforts. A true copy is appended hereto as Exhibit 9.

21. I also handled the production of a new video highlighting Gunther's technical capabilities and was responsible for developing a large trade show booth exhibit that showcased Gunther's newest technologies at the "Xplor" International show in Los Angeles, California. These marketing initiatives during this period, which was only nine months before my discharge, were the most time-consuming and labor-intensive efforts I undertook. I worked 80 to 100-hour weeks as the project necessitated many 12 to 14 hour days. I received nothing but compliments for these efforts.

22. Against this backdrop, I note that Mr. Perkins sets forth in his affidavit but two instances that he can cite in support of his claim that I was "incompetent": 1) his not having a hotel room reservation in connection with the Los Angeles trade show, and 2) my arrangement for company officials to be photographed for marketing purposes at the same time that Mr. Perkins expected to be photographed. In respect to the first instance, part of my responsibilities included securing reservations for a block of hotel rooms for Gunther employees attending the Los Angeles Trade Show in the fall of 1999. I was not, however, responsible for checking people into the hotel because it was my duty to remain with Gunther's marketing booth and engineers at all times. The actual dealings with the hotel were handled by the Xplor VIP Housing Bureau to whom I had submitted a request which the Bureau then forwarded to the hotel. On the night before the Xplor show opened, Marc Perkins appeared at a restaurant where Gunther staff was assembled. He arrived at the restaurant

12

in an agitated state and complaining, not about me, but about a problem with the home office which delayed his arrival in Los Angeles. I had nothing to do with that and Mr. Perkins was expressing upset with other staff. Mr. Perkins was yelling and before he finished, he also added, "by the way, I don't have a hotel room". Mr. Perkins did not address himself directly to me, however, but merely threw out the complaint about the hotel room openly before the whole group. Mr. Perkins never discussed with me directly any problem he had with his hotel room reservation. I was not requested or required to do anything further because it appears that Mr. Perkins did in fact secure a hotel room because he remained at the hotel throughout the conference for three days.

23.     In respect to Mr. Perkins other cited example, involving a photography shoot, the facts are these. Mr. Perkins' assistant had requested that I help secure a photographer for the purpose of taking photographs of Mr. Perkins. I was not told what the photographs would be used for. I did know at the time, however, that photographs of some five to six Gunther managers were needed for use in upcoming marketing materials. I assumed responsibility for arranging the photographs of Gunther managers prior to being advised by Mr. Perkins' assistant that Mr. Perkins would like a photograph taken of himself. Upon inquiry, I also determined that it would be significantly less expensive for Gunther if the photographer took all needed photographs on one occasion. I thus arranged for one photo shoot during which Mr. Perkins' photograph would be taken as requested. After the photography shoot was concluded, the only thing that I heard from Mr. Perkins was a comment from him to the effect that he did not expect other company officials to be photographed as well as himself. It was evidently Mr. Perkins' understanding that he alone would be photographed.

13

Law Offices of Karen Lee Torre • 51 Elm Street, Suite 307, New Haven, Connecticut 06510 • Tel: (203) 865-5541

He was unaware that other Gunther officials were being photographed for marketing purposes. He was unaware because he was not part of the discussions and planning in this regard in the marketing department. I received no conflicting directive from Mr. Perkins directly or indirectly in this regard. When I attempted to explain to Mr. Perkins that a decision had been made to photograph Gunther managers for marketing purposes, and that this was being arranged prior to his assistant's request, Mr. Perkins merely walked away from me and did not care to listen.

24. Apart from these two very brief encounters with Mr. Perkins, one of which did not even involve a direct discussion with me, Mr. Perkins never once advised me orally or in writing of any perceived performance problems. I assumed that Gunther's long-standing and consistent view of my performance was still the case and I never was advised otherwise until the moment of my discharge. Mr. Perkins never sought a meeting with me and never had any discussions with me regarding my employment, my responsibilities, or my performance.

25. Subsequent to my discharge, my job and duties were assumed by one Gary Schaefer. While I do not remember Mr. Schaefer's exact title, he had worked for Gunther for some six years at the time of my discharge. He was one of three account managers reporting to Daniel Chevelier. Other than discussions regarding internet articles, I did not have much direct substantive contact with Mr. Schaefer. My supervisor, Jewell Smokes, however, did not have complimentary things about Mr. Schaefer. To the contrary, Mr. Smokes was unhappy with what he perceived to be Mr. Schaefer's "lack of initiative". This was at a time when Mr. Schaefer was collaborating with and reporting to Mr. Smokes in connection with a marketing initiative. William Gunther, III also shared with me, on

14

more than one occasion, his view of Mr. Schaefer which also was not positive. Mr. Gunther expressed his view that Mr. Schaefer was lazy, difficult to "pin down" in terms of what work he was actually performing, and evasive in reporting his activities. Mr. Gunther's opinion was consistent with Mr. Smokes' view of Mr. Schaefer as "lacking initiative". While these comments were made to me by two Gunther officials, I had no substantive contact with Mr. Schaefer, did not supervise him and thus can report only what my superiors thought of him.

26.     Mr. Perkins states that my age "was unknown" to him, a statement that I find disingenuous. I was nearly 64 at the time Mr. Perkins ordered my termination from employment. Mr. Perkins knew me and, although he would not know my precise age, he would know from my physical appearance that I was a woman in her 60's.

27.     Lastly, Gunther issued to me an unemployment notice indicating I was discharged for "Lack of product knowledge". A true copy of that notice is attached hereto as Exhibit 10.

_____
KARIN SODERBERG

Subscribed and sworn to before me this ___7th___ day of November, 2003.

_____
Notary Public

CRYSTAL MOFFATT-TSOUKALAS
*NOTARY PUBLIC*
MY COMMISSION EXPIRES MAY 31, 2004